IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MURIEL S. CLARKE                    )
                                    )
v.                                  )      No. 2:06-0006
                                    )      Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION      )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff widow's
insurance benefits, as provided under Title II of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 26), to which defendant has responded
(Docket Entry No. 28).  Plaintiff has further filed a reply brief
in support of her position (Docket Entry No. 29).  Upon
consideration of these papers and the transcript of the
administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be DENIED, and
that the decision of the Commissioner be AFFIRMED.

1

## I.  BACKGROUND

The facts giving rise to this appeal are these:
Plaintiff was widowed on February 7, 1995, after nearly forty
years of marriage to the deceased wage earner, Mr. James P.
Smith, Sr. (Tr. 53).  At that time, plaintiff inquired with the
Social Security Administration ("SSA") about receiving benefits
on her late husband's account, and was awarded a small lump sum
death benefit which was the extent of her entitlement given her
age (57) at that time.  (Tr. 12, 83-84)  On February 17, 1997, at
the age of 59 and in the process of planning her wedding to Mr.
Clarke (whom she had met in the fall of 1995), plaintiff again
contacted the SSA inquiring about widow's benefits on her late
husband's account.  Plaintiff called the SSA's 1-800 number,
advised the individual who answered her call of her impending
wedding, and asked if getting remarried at her age would impact
her ability to draw widow's benefits.  (Tr. 12, 35, 54)  The SSA
representative informed plaintiff that her remarriage **at any age**
would disqualify her from receiving widow's benefits on her late
husband's account (<u>id.</u>), when in fact, the law allows for payment
of such benefits to a remarried widow, if the remarriage occurs
after the widow attains the age of sixty.  42 U.S.C. § 402(e)(3)
(deeming an otherwise entitled widow's remarriage after age 60
"not to have occurred").  In reliance upon the SSA
representative's faulty advice, and seeing no other reason to

2

delay, plaintiff married Mr. Clarke on June 7, 1997, eighteen days before her sixtieth birthday on June 25, 1997. Having done so, plaintiff will not be eligible to receive widow's benefits during her marriage to Mr. Clarke, absent the relief she seeks from this Court. Had plaintiff's remarriage been postponed a mere eighteen days, she would have been entitled to receive widow's benefits on her late husband's account from the time of her application therefor, potentially until her death. 42 U.S.C. § 402(e)(1).

The procedural history of this matter began with plaintiff's filing of an application for widow's benefits on February 5, 2002 (Tr. 52-54), following her discovery, when her accountant later questioned her lack of benefits, that she had been misinformed some five years earlier (Tr. 12, 35, 50). After having that application denied at both the initial and reconsideration stages of agency review (Tr. 55-59), plaintiff requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ") (Tr. 60, 81-91). On July 26, 2004, the ALJ issued a written decision which was fully favorable to plaintiff, finding her to be entitled to widow's benefits based on the application filed on February 5, 2002 (Tr. 34-36). The ALJ made the following enumerated findings:

1.    The claimant married the wage earner, James P. Smith, Sr., on May 7, 1955.

2.    The marriage ended when James P. Smith, Sr., died on

3

February 7, 1995.

3.  The claimant's testimony is fully credible as to the
    nature of the misinformation from SSA regarding how
    remarriage would affect entitlement to survivor's
    benefits.

4.  Due to the SSA misinformation, the claimant remarried
    18 days before her 60th birthday, which resulted in a
    denial of survivor's benefits as widow of James P.
    Smith, Sr.

5.  Because of the incorrect information the claimant
    received from SSA, it is determined that the claimant
    is entitled to surviving widow's benefits on the record
    of James P. Smith, Sr.

(Tr. 36)

On September 23, 2004, the SSA's Appeals Council

notified plaintiff of its decision to review the ALJ's decision

on its own motion, as well as plaintiff's right to request a

subsequent hearing before an ALJ (Tr. 38-42). On November 15,

2004, the Appeals Council took action consistent with the notice

previously given plaintiff, vacating the ALJ decision and

remanding the matter for a second ALJ hearing and decision,

consistent with plaintiff's request (Tr. 47-48). The Appeals

Council gave the following rationale for their decision:

> ... The Appeals Council finds that the Administrative
> Law Judge's decision contains an error of law.
>
> In order to be entitled to benefits as a widow, an
> individual must be unmarried or have remarried after
> age 60 or after attaining age 50 but before attaining
> age 60 and at the time of the remarriage be entitled to
> widow's benefits as a disabled widow (or meet the
> disability requirements at the time of remarriage)(20
> CFR 404.335).

4

> The law provides relief for individuals who have
> received misinformation regarding potential entitlement
> to benefits, however that relief is limited to a
> protected application filing date (section 202(j)(5) of
> the Act and 20 CFR 404.633).  The receipt of
> misinformation does not except a claimant from a
> requirement for entitlement, such as being "not
> married" (section 202(e)(1)(A) and (3) of the Act and
> Social Security Ruling 70-19c).
>
> The record indicates that the claimant married her
> current spouse, Donald H. Clarke, on June 7, 1997 and
> that her date of birth is June 25, 1937 (Exhibit 2).
> Thus, the claimant remarried prior to attaining age 60.
> The record contains no indication that the claimant is
> disabled.  Accordingly, it does not appear she meets
> the requirement of being "not married."

(Tr. 47-48)

The matter was remanded to a different ALJ, who heard

the case on June 9, 2005 (Tr. 92-111).  On July 27, 2005, the new

ALJ issued a written decision (Tr. 12-14) that was even more

favorable to plaintiff than that of the first ALJ, in that

plaintiff's February 2002 application was given a deemed filing

date of June 25, 1997, plaintiff's sixtieth birthday and the date

upon which plaintiff presumably would have filed her application

but for the misinformation she received.  The ALJ's narrative

opinion contained the following rationale:

> The undersigned finds that the claimant is totally
> credible.  There is no doubt that she would have
> postponed her wedding for 18 days to get benefits from
> her late husband's record, if she had been given the
> correct information.  She was married for almost forty
> years and obviously would not have sacrificed the
> benefits due her from her husband paying into the
> system knowingly.
>
> Denying benefits in this situation would be

5

nonsensical. The claimant could not obtain a divorce or annulment because she would lose health insurance benefits. Her husband is Catholic and does not believe in divorce. It would be absurd to make her take these steps to obtain benefits. The undersigned finds that in this particular situation, the receipt of misinformation exempts the claimant from this requirement for entitlement.

(Tr. 13)

On September 21, 2005, the Appeals Council again gave plaintiff notice of own motion review (Tr. 75-78), and rendered a final decision on the matter on November 2, 2005 (Tr. 7-8). The substance of this decision is essentially the same as the November 2004 Appeals Council decision, the bottom line being that relief for misinformed claimants is limited to a protected application filing date; "[t]he receipt of misinformation does not except a claimant from a requirement for entitlement, such as being 'not married.'" (Tr. 8) In light of plaintiff's remarriage prior to the age of sixty, the Appeals Council found that she is not entitled to widow's benefits "based on the application deemed to have been filed on June 25, 1997," noting that "[t]his finding of fact is made irrespective of the filing date of the claimant's application." (Id.)

The November 2, 2005 Appeals Council decision stands as the final decision of the Commissioner. (Tr. 4) This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the

6

record as a whole, then these findings are conclusive.  Id.

## II.  CONCLUSIONS OF LAW

The deferential substantial evidence standard of review applies to the Commissioner's findings of fact, which in this case are not challenged; there is no dispute as to the underlying facts as found by both ALJs to review the matter and hear testimony.  Moreover, plaintiff does not challenge the Commissioner's interpretation of the statute in his finding that, as a matter of law, the receipt of misinformation could not exempt plaintiff from the statutory requirement that she be unmarried prior to attaining the age of sixty, except by her passing argument that a more liberal construction of the statute is necessary to effectuate its remedial purpose.  Rather, plaintiff primarily appeals to this Court's equity powers for a finding that the Commissioner is estopped from denying widow's benefits, on account of her reasonable, detrimental reliance upon the misinformation given her by an authorized source within the SSA.  As explained below, the undersigned finds the issue of equitable estoppel against the government for the payment of money to be squarely controlled by the U.S. Supreme Court's decision in Office of Personnel Mgmt. v. Richmond, 496 U.S. 414 (1990), and accordingly recommends that plaintiff's motion for judgment be denied.

7

## The Statute

The operation of the misinformation provision, 42 U.S.C. § 402(j)(5), is not truly at issue here, although the parties spar over its proper application to the facts of this case. The statute provides as follows:

> In any case in which it is determined to the satisfaction of the Commissioner of Social Security that an individual failed as of any date to apply for monthly insurance benefits under this title by reason of misinformation provided to such individual by any officer or employee of the Social Security Administration relating to such individual's eligibility for benefits under this title, such individual shall be deemed to have applied for such benefits on the later of—
>
> (A) the date on which such misinformation was provided to such individual, or
>
> (B) the date on which such individual met all requirements for entitlement to such benefits (other than application therefor).

Id. Pursuant to this provision, as applied by the second ALJ and at least tacitly approved by the Appeals Council (Tr. 8), plaintiff's 2002 application was deemed to have been filed on June 25, 1997, her sixtieth birthday. The problem remains that plaintiff was not unmarried on that date, having wed Mr. Clarke eighteen days earlier. Logically subsumed within the finding that, but for her receipt of misinformation, plaintiff would have filed her application on June 25, 1997, is the finding that, but for her receipt of misinformation, plaintiff would have delayed her remarriage so as to ensure that her filing on June 25, 1997

8

would be valid.  Unfortunately, the plain language of the statute only forgives the untimely filing in this case, not the untimely remarriage.

Moreover, the deeming of a filing date between the later of (1) the receipt of misinformation and (2) the satisfaction of all entitlement criteria except for the filing of an application, plainly appears to contemplate the establishment of a deemed filing no sooner than the claimant has otherwise demonstrated her entitlement to benefits, although the literal language of the statute could in this case be read to authorize a deemed filing date as of the date of plaintiff's receipt of misinformation in February 1997, since she never satisfied the requirement of being simultaneously unmarried and sixty years old.  (The agency recognition of plaintiff's sixtieth birthday as an appropriately deemed filing date may only be supported by waiver of the requirement that she also be unmarried as of that date, which the statute does not contemplate and the Appeals Council specifically forbade.)  Plaintiff argues that there is room for variance from the literal language of the statute, offering the common sense conclusion that "[i]f not for the misinformation, the Plaintiff would have waited an extra 18 days and been eligible to file for widow's benefits on June 25, 1997," (Docket Entry No. 26 at 5), and concluding her reply brief with the statement that "Congress intended the [S]ocial [S]ecurity

9

[A]ct to be liberally construed to effectuate the congressional purpose of providing benefits to the widows of wage earners." (Docket Entry No. 29 at 2)  Indeed, the Sixth Circuit Court of Appeals has recognized "that the Social Security Act 'is a remedial statute, to be broadly construed and liberally applied [and] ... that obvious exceptions must be read into the statute when to do so is necessary to effectuate its purpose.'"  O'Daniel v. Richardson, 458 F.2d 330, 334 (6th Cir. 1972)(quoting Haberman v. Finch, 418 F.2d 664, 667 (2d Cir. 1969)).  However, the argument for liberal construction has been more recently regarded by the U.S. Supreme Court as "that last redoubt of losing causes," one which should only prevail

> in the case of ambiguity, to find present rather than
> absent elements that are essential to the operation of
> a legislative scheme; but it does not add features that
> will achieve the statutory "purposes" more effectively.
> Every statute proposes, not only to achieve certain
> ends, but also to achieve them by particular means–and
> there is often a considerable legislative battle over
> what those means ought to be.  The withholding of
> agency authority is as significant as the granting of
> it, and we have no right to play favorites between the two.

Director, Office of Workers' Comp. Programs, Dept. of Labor v. Newport News Shipbuilding and Dry Dock Co., 514 U.S. 122, 135-36 (1995).

This case presents the unfortunate scenario where the remedial misinformation provision is triggered by the undisputed fault of the government agent, but falls short of providing

10

meaningful relief due to the immediate consequence of plaintiff's being misinformed, a consequence which would easily have been averted if plaintiff's question had been correctly answered. However, the misinformation statute is not ambiguous; it plainly applies solely to cure a particular inequity in the enforcement of the filing requirement applicable across several categories of old-age, survivors', and disability benefits, without speaking to any other entitlement requirement for claims to any particular class of benefits. It thus appears that Congress intended to remedy the instance in which the statutory purpose was most commonly thwarted, i.e., the instance in which otherwise entitled citizens lost a determinate period of their entitlement due to bad agency advice. While the fact that plaintiff lost the *entirety* of her entitlement due to her action in reliance upon bad agency advice is compelling in terms of weighing the equities, it is inapposite to the operation of the unambiguous statutory language.

Moreover, both Congress and the Commissioner have recognized other, specific instances where the receipt of misinformation will not be allowed to prejudice the applicant, one of which involves the situation of an applicant who effectively waives her potential entitlement to a period of benefits by filing a new application rather than appealing the denial of a previous application, in good faith reliance upon the

11

"incorrect, incomplete, or misleading" advice of an employee of the SSA or a state agency affiliate. 42 U.S.C. § 405(b)(3)(A). The law and regulations also make specific reference to relief when the applicant is overpaid benefits for which she did not meet one or more requirements for entitlement, but is without fault for the overpayment because of the reliance-inducing misinformation provided by an official agency source. 42 U.S.C. § 404(b); 20 C.F.R. §§ 404.509(a)(1), 404.510a. It is thus clear that Congress knows how to enact measures for the preservation of "equity and good conscience," 42 U.S.C. § 404(b), but has chosen not to so legislate in the area of the more substantive requirements for entitlement to survivors' benefits.

Furthermore, citizens are generally charged with knowing the law governing their entitlement to benefits, if not the time or the manner of availing themselves of that entitlement. See, e.g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947)("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."). Admittedly, had plaintiff gone to the statute to confirm the agent's advice in this case, confirmation is exactly what she likely would have perceived, since the section governing widow's benefits clearly provides first that the widow has to be "not

12

married" and "age 60" in order to be entitled, 42 U.S.C. §
402(e)(1)(A), and then provides that the entitlement ends "with
the month preceding the first month in which any of the following
occurs:  she remarries...," § 402(e)(1); one must read another
two code book pages of nearly indecipherable statutory text
before encountering § 402(e)(3), which deems marriage after
attaining age 60 not to have occurred and entirely nullifies the
previously cited language regarding remarriage ending
entitlement.[1]  However, the Commissioner's regulations on the

_____

[1]At the risk of undermining what the undersigned considers to be the
only correct decision under the law, it is noted that if it were appropriate
to weigh the equities in this case upon plaintiff's estoppel claim, this
inconsistent statutory language would appear to significantly mitigate
plaintiff's responsibility to know the law – one of two factors upon which the
line of decisions denying estoppel against the government (discussed in the
parties' briefs) is founded.  While the regulations are much more reader-
friendly, plaintiff could hardly be faulted for going straight to the statute
and ceasing her research upon reading the entitlement language of § 402(e)(1).
Moreover, as referenced above, one of the Commissioner's own regulations
acknowledges that misinformed claimants are to be deemed without fault in
failing to know the law governing their entitlement.  20 C.F.R. § 404.510a.
   The second factor featured in the line of cases denying estoppel against
the government is the misinformant's lack of authority to bind the government.
In cases involving the SSA, the agent's employment at a _local_ office of the
agency has been stressed.  However, in this case, the agent was contacted
through a national toll-free telephone number, which at the time was
presumably held out by the SSA as the number to call to get answers which the
local representatives may not have.  Presently, the SSA website,
http://www.ssa.gov/reach.htm, encourages members of the public to use its
toll-free telephone number rather than contacting local offices for answers to
their questions and solutions to their problems.  Moreover, the authority of
the help-line employee was not questioned by the Appeals Council or either ALJ
to hear the matter.
   In light of the SSA's solicitation of inquiries to its 1-800 number,
there would not appear to be any reason for concern over the misinformation
being given orally in this case.  _Cf._ _also_ 20 C.F.R. § 404.633(a).
Furthermore, it is at least arguable that the "affirmative misconduct"
requirement for estopping the government was satisfied here, in that the agent
was held out as the authority with respect to the applicability of the
provisions of the byzantine statute, and it appears that the agent could
simply have answered (correctly) the question presented to him by stating
that, yes, remarriage on the date contemplated by plaintiff would disqualify
her from receiving widow's benefits, but instead the agent exceeded the scope
of the inquiry and affirmatively stated that remarriage _at any age_ would

13

subject provide far more clarity, plainly stating that entitlement depends upon the claimant being "unmarried, unless ... [y]ou remarried after you became 60 years old," 20 C.F.R. § 404.335(e)(1), and making no reference to entitlement ending upon remarriage, 20 C.F.R. § 404.337. Thus, the law governing plaintiff's entitlement is unambiguous, if not (with regard to § 402(e)) particularly well written. Therefore, there is no room to construe either the entitlement or the misinformation provisions of the statute in such a way as to allow plaintiff's recovery despite her untimely remarriage.

<u>The Law of Equitable Estoppel</u>

In the absence of any legal remedy, plaintiff has sought forgiveness of her untimely remarriage under the doctrine of equitable estoppel, which might have been theoretically available prior to the Supreme Court's decision in <u>OPM v. Richmond</u>, <u>supra</u>,[2] but not thereafter.

The government's brief only cites <u>Richmond</u> for the

---

extinguish plaintiff's entitlement to benefits, an authoritative response that obviously left no room for doubt in plaintiff's mind -- this despite the law having changed more than thirty years earlier to allow continued receipt of benefits upon remarriage after age 60.

As stated elsewhere in this report, it is the opinion of the undersigned that the decision in this case is directed by the U.S. Supreme Court's adoption of a flat rule against equitably estopping the government in order to secure the payment of money from the federal treasury. However, this decision is reached with no small amount of distaste for the resulting windfall to the government of benefits some forty years in the earning, upon facts which otherwise have the potential to justify the rare imposition of equitable estoppel against the government.

[2]<u>But</u> <u>see</u> <u>Terrell v. Finch</u>, 302 F.Supp. 1063 (S.D. Tex. 1969), adopted as policy by the SSA and involving facts nearly identical to those under review here, upon which the court declined to estop the government.

proposition that affirmative misconduct on the part of the misinformant is a required element of an equitable estoppel against the government. (Docket Entry No. 28 at 8) However, the Supreme Court in Richmond merely acknowledged that its prior decisions had left open the possibility that such misconduct might give rise to estoppel in the appropriate case, though such an appropriate case had never been presented to the Court. Id. at 421-22. The Court in Richmond took inventory of its prior decisions in cases seeking equitable estoppel against the government, id. at 419-23, beginning with a decision rendered in 1813 and highlighted by the decision in Federal Crop Ins. Corp. v. Merrill, supra, "the leading case in our modern line of estoppel decisions" and the case relied upon by the Court in Schweiker v. Hansen, 450 U.S. 785 (1981), wherein "the duty of all courts to observe the conditions defined by Congress for charging the public treasury" defeated a claim of estoppel based on misinformation which led the claimant to fail to apply for social security survivors' benefits. While recognizing that these prior holdings had resulted in "a strict rule against estoppel," 496 U.S. at 426, the Court concluded its discussion of these prior cases by rejecting the government's argument that it should adopt a flat rule against government estoppel in any and all circumstances, in favor of a more circumscribed approach to the particular type of claim at issue in Richmond, as here: "a

15

claim for payment of money from the Public Treasury contrary to a statutory appropriation." Id. at 423-24. Relying on the Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, the Court reversed the extrastatutory award of six months worth of annuity payments from a government disability fund, which the court below had ordered upon finding the government to be equitably estopped due to Mr. Richmond's detrimental reliance on misinformation from a government employee. The Court stated that "[e]ven on the assumption that much equity subsists in respondent's claim, we cannot agree with him or the Court of Appeals that we have authority to order the payment he seeks." Richmond, 496 U.S. at 416. The Court explained as follows:

> For the particular type of claim at issue here, a claim
> for money from the Federal Treasury, the Clause
> provides an explicit rule of decision. Money may be
> paid out only through an appropriation made by law; in
> other words, the payment of money from the Treasury
> must be authorized by a statute. All parties here
> agree that the award respondent seeks would be in
> direct contravention of the federal statute upon which
> his ultimate claim to the funds must rest, 5 U.S.C. §
> 8337. The point is made clearer when the appropriation
> supporting the benefits sought by respondent is
> examined. In the same subchapter of the United States
> Code as the eligibility requirements, Congress
> established the Civil Service Retirement and Disability
> Fund. § 8348(a)(1)(A). That section states in
> pertinent part: "The Fund ... is appropriated for the
> payment of ... benefits *as provided by* this
> subchapter...." (Emphasis added.) The benefits
> respondent claims were not "provided by" the relevant
> provision of the subchapter; rather, they were
> specifically denied. It follows that Congress has
> appropriated no money for the payment of the benefits
> respondent seeks, and the Constitution prohibits that
> any money "be drawn from the Treasury" to pay them.

16

<u>Id.</u> at 424.

The Court went on to conclude that "judicial use of the equitable doctrine of estoppel cannot grant ... a money remedy that Congress has not authorized," emphasizing that its refusal to adopt "an across-the-board no-estoppel rule" made it "all the more important to state the law and settle the matter of estoppel as a basis for money claims against the Government." <u>Id.</u> at 426. In so doing, the Court declined to advert to Mr. Richmond's "'conception of enlightened governmental policy,'" <u>id.</u> at 432-34 (<u>quoting</u> <u>United States v. Testan</u>, 424 U.S. 392, 400 (1976)), finding instead that "[t]he whole history and practice with respect to claims against the Untied States reveals the impossibility of an estoppel claim for money in violation of a statute." <u>Id.</u> at 430.

Plaintiff argues that the law governing estoppel against the government changed with the enactment of the Omnibus Budget Reconciliation Act ("OBRA") of 1989, which contains the text of the misinformation provision at issue here. Indeed, it appears that OBRA was enacted to address the specific situation for which the Court refused to provide equitable relief in <u>Schweiker v. Hansen</u>, <u>supra</u>, i.e., the failure of an otherwise entitled claimant to file an application due to agency misinformation. However, <u>Richmond</u> was decided after OBRA's enactment, and indeed OBRA was cited in <u>Richmond</u> as a

17

"particular[ly] relevan[t]" example of appropriate relief *by Congress* in response to "concern[] at the possibility of significant detrimental reliance on the erroneous advice of Government agents...." Id. at 428-29. Thus, OBRA's enactment cannot be deemed to disturb the foundation of modern estoppel jurisprudence, which is that only Congress is empowered to define the conditions for charging the public treasury, and "not even the temptations of a hard case can elude the clear meaning" of the statute at issue. Merrill, 332 U.S. at 386.

Plaintiff further seeks to distinguish the old line of estoppel cases discussed in Richmond by arguing that, in this case, the misinformation did not bind the government to any payment of money, whereas in the older cases the denial of estoppel was largely driven by the agent's lack of authority to bind the government to an expenditure from the public fisc. Again, however, the Richmond Court found that "[t]he equities are the same whether executive officials' erroneous advice has the effect of frustrating congressional intent to withhold funds or to pay them." 496 U.S. at 429. In observing the constitutional mandate to defer to congressional authority when the expenditure of public money is at issue, the Court noted that Congress has always reserved the power to act through private claims bills when "'the equities and circumstances of a case create a moral obligation on the part of the Government to extend relief to an

18

individual.'"  Id. at 431 (quoting Subcommittee on Administrative

Law and Governmental Relations of the House Committee on the

Judiciary, Supplemental Rules of Procedure for Private Claims

Bills, 101st Cong., 1st Sess., 2 (Comm. Print 1989)).  The Court

concluded by holding as follows:

> The rationale of the Appropriations Clause is that if
> individual hardships are to be remedied by payment of
> Government funds, it must be at the instance of
> Congress. ... Whether there are any extreme
> circumstances that might support estoppel in a case not
> involving payment from the Treasury is a matter we need
> not address.  As for monetary claims, it is enough to
> say that this Court has never upheld an assertion of
> estoppel against the Government by a claimant seeking
> public funds.  In this context there can be no
> estoppel, for courts cannot estop the Constitution.

Id. at 434.

        The undersigned can conceive of no basis for finding

the issue in the instant case to be materially distinguishable

from the issue in Richmond.  Like the statute in play in

Richmond, subchapter II of the Social Security Act creates the

Federal Old-Age and Survivors Insurance Trust Fund and

appropriates public monies to that fund, 42 U.S.C. § 401(a);

directs that all old-age and survivors' "benefit payments

required to be made under this subchapter" shall be made only

from that trust fund, § 401(h); and specifically denies

entitlement to the widow's benefits sought here if the widow is

married at the time of her application and the marriage was

accomplished before the widow attained the age of sixty, 42

19

U.S.C. § 402(e)(1), (3).  Cf. Richmond, 496 U.S. at 424 (quoted supra at 16).  Moreover, a review of cases out of this circuit, which were decided after Richmond and in which equitable estoppel against the government was either ordered or considered upon the individual's attempt to prove affirmative misconduct, shows that the claims involved did not seek the payment of money, but sought a defensive application of equitable estoppel.  See Fisher v. Peters, 249 F.3d 433 (6th Cir. 2001); United States v. Guy, 978 F.2d 934 (6th Cir. 1992); Bunting v. Railroad Retirement Bd., 1993 WL 372735 (6th Cir. Sept. 22, 1993); L.E.F., Inc. v. United States, 1997 WL 1037879 (E.D. Mich. July 23, 1997).

As the rule in Richmond has not been reversed by the Supreme Court or abrogated by congressional amendment to the Social Security Act, this Court is bound to follow that rule here.  Therefore, plaintiff's remedy must lie with Congress and its provisions for private claims bills.  The undersigned must conclude that the decision of the Commissioner to deny widow's benefits is supported by substantial evidence and free from legal error, and should therefore be affirmed.


III.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the

20

Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 18th day of October, 2007.

     s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

Case 2:06-cv-00006  Document 31  Filed 10/18/07  Page 21 of 21 PageID #: 112